# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **WAHIID MUJAHEED ALAMIIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-08-1371-F** |
| | ) | |
| **DAVID MILLER, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Wahiid Mujaheed AlAmiin a/k/a/ James Shockey, a prisoner appearing pro se, has filed this action under 42 U.S.C. §1983 alleging violation of his constitutional rights and his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). United States District Judge Stephen P. Friot has referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. §636(b)(1)(B). Currently before the Court are two motions to dismiss/for summary judgment: Motion to Dismiss/Motion for Summary Judgment of Defendants Miller, Halvorson, Carns, and Tinker [Doc. No. 41], and Motion to Dismiss/Motion for Summary Judgment of Defendant Morton [Doc. No. 39]. Plaintiff has responded, and thus the motions are at issue and ready for disposition.

In a four-count complaint, Plaintiff alleges that Defendants have violated his right of access to the courts, his right to religious freedom, and his right to adequate medical care. In Count I, Plaintiff alleges that Defendants Miller and Morton violated his right of access to the courts by denying training and assistance on use of the Oklahoma Department of

Corrections' (ODOC) grievance policy, and by discouraging him from using the system by charging a fee of $2.00 for grievance appeals. Amended Complaint, 11-14.  In Count II, Plaintiff alleges that Defendants Miller, Morton, Brown,[1] and Tinker denied his right to a religiously-mandated halal diet in violation of the Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). Amended Complaint, 14-17.  In Count III, Plaintiff contends that Defendants Miller, Morton, and Tinker violated his constitutional and RLUIPA rights by denying him the opportunity to participate in congregational prayer, denying his request to observe some aspects of Ramadaan, and denying his request to carry prayer oil on his person. Amended Complaint, 17-19.  Finally, in Count IV, Plaintiff alleges that Defendants Carn and Halvorson denied him adequate medical care in violation of the Eighth Amendment. Amended Complaint, 19. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.  Amended Complaint, 23.

## I.  THE PENDING MOTIONS

As noted, there are two separate motions to dismiss/for summary judgment now at issue. Each motion seeks dismissal on several grounds, some of which are common to both motions.  Accordingly, in an effort to avoid repetition, the discussion will be organized according to the claims raised in the Amended Complaint. However, the two pending motions will be summarized before turning to the discussion.

---

[1]Claims against Defendant Brown were dismissed without prejudice due to Plaintiff's failure to timely serve him. [Doc. Nos. 51, 58].  Plaintiff filed a motion seeking relief from this order, and his motion was denied. [Doc. Nos. 59, 60].  Plaintiff has filed another motion for relief from the order dismissing Defendant Brown, which is still pending. [Doc. No. 61].  As that motion is asking relief from Judge Friot's orders, the undersigned has not addressed it.

## A. MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT OF DEFENDANT MORTON

Defendant Morton moves for dismissal on five grounds. First, she claims that some of Plaintiff's claims against her are barred by the applicable statute of limitations. Motion to Dismiss/Motion for Summary Judgment of Defendant Morton, 2. (Morton's Motion to Dismiss). Second, she claims that none of Plaintiff's claims against her are exhausted. Morton's Motion to Dismiss, 3. Third, she contends that Plaintiff has failed to show her personal participation in the acts alleged. Id. at 5. Fourth, in her official capacity, Morton asserts Eleventh Amendment immunity with regard to Plaintiff's claims for monetary relief. Id. at 7. Fifth, and finally, Morton contends that Plaintiff's claims regarding the grievance process fail to state a constitutional claim for denial of access to the courts. Id. at 9.

## B. MOTION TO DISMISS OF DEFENDANTS MILLER, HALVORSON, CARNS, AND TINKER

These Defendants move for dismissal or summary judgment on six grounds. They first claim that Plaintiff has failed to exhaust his claims for denial of access to the courts, denial of a halal diet, denial of religious services and objects, and denial of medical care. Motion to Dismiss/Motion for Summary Judgment of Miller, Halvorson, Carns, Tinker (Motion of Defendant Miller), 4-9. Next, these Defendants allege that Plaintiff has failed to show their personal participation in the acts alleged. Id. at 9-11. Third, they claim that Plaintiff has failed to establish an actual injury stemming for the alleged denial of access to the courts. Motion of Defendant Miller, 11-13. Fourth, they argue that Plaintiff cannot show deliberate indifference to his serious medical needs. Id. at 13-17. Fifth, they argue that

Plaintiff is not entitled to any relief against them under RLUIPA.  Id. at 17-24.  Finally, they

contend that Plaintiff has failed to demonstrate a violation of the Free Exercise clause.  Id.

at 24-27.

## II. STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment may be granted only where the pleadings and any supporting

documentary materials "show that there is no genuine issue as to any material fact and that

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering

a motion for summary judgment, the court views the evidence and the inferences drawn from

the record in the light most favorable to the nonmoving party.  Calhoun v. Gaines, 982 F.2d

1470, 1472 (10th Cir. 1992); Manders v. Oklahoma, 875 F.2d 263, 264 (10th Cir. 1989).  A

dispute is "genuine," when viewed in this light, if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby Inc., 477 U.S.

242, 248 (1986).  "Material facts" are "facts that might affect the outcome of the suit under

the governing law."  Id.

To obtain summary judgment, the moving party need not affirmatively negate the

nonmovant's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Rather, the

moving party initially bears the burden only of " 'showing' - that is, pointing out to the

district court - that there is an absence of evidence to support the nonmoving party's case."

Id., at 325.  Once the moving party has satisfied this burden, the burden shifts to the

nonmoving party to show that there is a genuine issue of material fact.  Id. at 324. The

nonmoving party "may not rest upon mere allegation" in his pleading to satisfy this

requirement  Anderson, 477 U.S. at 256.  Rather,  Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324.

## III.  DISCUSSION

### A.  COUNT I, DENIAL OF RIGHT OF ACCESS TO THE COURTS

In his initial claim, Plaintiff alleges that he was "denied his constitutional rights to proper uses and training of ODOC OP-090124 and denied the property interest on the $2.00 usage charge without and denial of a liberty interest to proper training thereof, this causing continuous failures."  Amended Complaint, 11.

He claims that "retaliation measures" in the form of a grievance restriction were taken by Defendant Morton, further frustrating his efforts to pursue non-frivolous claims for violations of his clearly-established constitutional rights.  Id. at 12.  He claims that Defendant Miller held some grievances filed by Plaintiff before he was placed on grievance restriction so they would be subject to the grievance restriction policy, further hindering Plaintiff's access to the courts.  Amended Complaint, 12.  He claims that Defendants Morton and Miller knew or should have known that his constitutional right of access to the courts requires them to assist Plaintiff in the preparation and filing of non-frivolous claims.  Id. at 14.  Finally, he claims that Defendants Morton and Miller used the $2.00 fee for grievance appeals to make Plaintiff choose between his property interest in monies sent from home and participation in the grievance system (about which he allegedly received no training).  Id. at

14.

Although Defendants Morton and Miller move for dismissal or summary judgment on grounds that this claim is unexhausted, is partially time-barred, and fails to adequately allege their personal participation, they also argue that Plaintiff has failed to show any denial of his constitutional right of access to the courts. Motion of Morton, 2, 3, 5, 9; Motion of Defendant Miller, 4, 9, 11. The undersigned will limit the discussion to this last proposition as it is dispositive of the claim raised in Count I.[2]

Plaintiff's claim is based primarily on his argument that the prison grievance policy requires assistance and training as to the proper method of submitting a grievance. Amended Complaint, 13 (citing ODOC OP-090124(III)(A), (B), and (C)).[3] He claims that such training is also required by his "fundamental liberty interest and constitutional right of access to the courts...." Amended Complaint, 14. He concludes that his ability to exhaust his administrative grievances has been hindered by the lack of training, thus violating his right of access to the courts. Id.

In her motion to dismiss, Defendant Morton argues that this claim should be dismissed because Plaintiff does not show an actual injury stemming from her actions during the

---

[2]Dismissal of this claim without first requiring exhaustion of administrative remedies is authorized by 42 U.S.C. § 1997e(c)(2).

[3]These provisions state that staff will provide assistance as to the proper method of submitting a grievance, that the grievance process will be explained to offenders upon reception and assessment, and that all department staff, employees of private prisons and community contract facilities, and volunteers will receive documented training in the grievance process during orientation and pre-service training.

grievance process. Motion of Defendant Morton, 11. She also contends that the prison's grievance procedure confers no substantive due process rights. Id. Accordingly, she concludes that Plaintiff's allegations fail to state a claim for violation of his First and Fourteenth Amendment rights. Motion of Defendant Morton, 11. Defendant Miller also moves for dismissal based on Plaintiff's failure to show any actual injury.

The Supreme Court has recognized a fundamental constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817, 828 (1977). As the Court has made clear, however, prisoners are entitled to meaningful, but not total or unlimited, access to the courts. Id. at 823. Further, an inmate's contentions of deprivation of access to courts must show actual injury, not mere deprivation, as a "constitutional prerequisite" to bringing a claim. Lewis v. Casey, 518 U.S. 343, 351 (1996).

> Because Bounds did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone,"and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

Lewis, 518 U.S. at 351. Thus, the right of access to the courts prohibits prison officials from actually hindering a prisoner's efforts to bring a non-frivolous legal claim. Green v. Johnson,

977 F.2d 1383, 1389-90 (10th Cir.1992). However, without a showing of actual injury there is no constitutional violation. <u>Lewis</u> 518 U.S. at 351.

In his response, Plaintiff argues that the alleged denial of access to the courts has caused "irreparable harm of heart disease, chronic back pain, etc. as alleged in Amended Complaint." Plaintiff's Response, 19. However, Plaintiff is confusing the injuries allegedly caused by violation of his Eighth Amendment rights with the actual injury required to support violation of his right of access to the courts. <u>See Lewis</u>, 518 U.S. at 351 (shortcomings must in some way hinder efforts to bring an actionable legal claim to the courts). Accordingly, the undersigned finds that Plaintiff has failed to come forward with evidence of any actual injury resulting from his allegations regarding the grievance process.

Moreover, the Tenth Circuit has determined that prison grievance procedures do not create a protected liberty interest and, therefore, do not implicate a prisoner's due process rights under the Fourteenth Amendment. <u>Murray v. Albany County Board of County Commissioners</u>, No. 99-8025, 2000 WL 472842, at *2 (10th Cir. Apr. 20, 2000) ("[P]rison grievance procedures do not 'give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment.'"); <u>Anderson v. Colorado Department of Corr.</u>, No. 98-1477, 1999 WL 387163, at *2 (10th Cir. June 14, 1999) (allegations relating to requirements of prison's grievance procedure do not create any liberty interest).[4] Because ODOC's grievance policy does not create any liberty interest, Plaintiff's allegations that

---

[4]These and any other unpublished decisions are cited as persuasive authority pursuant to Tenth Circuit Rule 32.1.

Defendants Morton and Miller denied his request for training on the policy's requirements do not state a claim under the Fourteenth Amendment. See <u>Walters v. Corr. Corp. Of America</u>, No. 04-6067, 119 Fed. Appx. 190, 191 (10th Cir. Dec. 7, 2004) (as evidenced by the complaint before the court, any alleged denial of access to administrative grievance procedures has not resulted in a violation of constitutional right of access).

Plaintiff also argues that Defendants Morton and Miller have used the mandatory co-pay for grievance appeals and medical requests as "retaliation" and to force Plaintiff to choose between buying products from the canteen or pursuing his grievances or medical requests. Amended Complaint, 14. He further contends that the fee policy violates his right to due process because he has not been trained in use of the grievance procedure. <u>Id.</u>

ODOC OP-090124(VII)(B)(2) requires inmates to pay $2.00 per grievance submitted to the administrative review authority. Special Report, Ex. 3 (Offender Grievance Process). The policy also states that offenders will not be denied the opportunity to appeal if they do not have adequate funds; if there are not enough funds to pay the fee, it will be collected as soon as funds become available. <u>Id.</u> Furthermore, if relief is granted by the administrative review authority, no co-pay is collected at all. <u>Id.</u> [5]

Due process requires only "such procedural protections as the particular situation demands." <u>Morrisey v. Brewer</u>, 408 U.S. 471, 481 (1972). With respect to the co-payments

_____

[5]Similarly, as Plaintiff notes, offenders are charged a $2.00 co-payment fee for each offender-initiated request for a medical, dental or optometric service, and $2.00 for each medication issued; however, offenders are not refused health care because of their financial status. ODOC OP-14-0117 (III)(F)(2) <http://www.doc.state.ok.us/Offtech/op140117.pdf> (accessed Apr. 28, 2010).

for grievance appeals and medical services, Plaintiff was provided adequate due process protections through the written policy which gave him both notice and a meaningful way to prevent the deprivation.[6] Accordingly, the deduction of funds from his inmate account for grievance appeals is not a violation of his right to due process. Moreover, the risk of erroneous deductions by ODOC is unlikely because the deductions [from Plaintiff's draw account] are routine and ministerial. See Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 422 (3rd Cir. 2000) (assessments and deductions from detainees' accounts for costs of incarceration "involve routine matters of accounting, with a low risk of error" and "essentially ministerial matters" as to which pre-deprivation proceedings were not constitutionally required). Finally, "challenged prison conditions cannot give rise to a due process violation unless those conditions constitute 'atypical and significant hardship[s] on [inmates] in relation to the ordinary incidents of prison life.'" McKune v. Lile, 536 U.S. 24, 37 (2002) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). The fact that Plaintiff may not be able to spend discretionary funds as a result of an unsuccessful grievance appeal does not constitute an "atypical and significant hardship" when compared to other inmates.

Furthermore, the imposition of a co-pay for the administrative costs associated with the processing of grievance appeals does not deprive Plaintiff of access to the courts anymore than does the imposition of a filing fee for actions brought in this Court. The ODOC policy,

---

[6]Plaintiff has only alleged that the co-pays were deducted pursuant to the grievance policy. Even if he had alleged that someone had removed funds from his account without authorization, ODOC provides Plaintiff with a post-deprivation remedies through the inmate grievance procedures. Hudson v. Palmer, 468 U.S. 517, 533 (1984).

like the law governing actions brought in the federal courts, allows those who are in forma pauperis to bring a grievance appeal without prepayment of the fee, but the filing fee must ultimately be paid as funds become available. 28 U.S.C. 1915(b)(1) and (4). Requiring an inmate to choose between paying the grievance appeal co-pay and purchasing canteen items is not improper, as is demonstrated by the analogous situation where the courts have approved dismissal of an in forma pauperis inmate's court action where he spends his money on amenities at the prison canteen rather than making payments on the filing fee. Cf. Cosby v. Meadors, 351 F.3d 1324, 1327 (10th Cir. 2003).

Finally, although Plaintiff states that the co-pays have been imposed in "retaliation," he has shown no more than the fact that co-pays were deducted from his inmate account in conformance with ODOC's uniform policy on the matter. "Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his [constitutional rights.]" Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990). "This principle applies even where the action taken in retaliation would be otherwise permissible." Id. at 948. In order to demonstrate actionable retaliation, however, the plaintiff must at least provide circumstantial evidence of a "chronology of events" supporting an inference of retaliation. Id. at 949. Plaintiff's retaliation claim against Defendants Miller and Morton are conclusory and fail to show a chronological connection supporting an inference of retaliation. Merely charging Plaintiff the same co-pay uniformly required of all inmates in accordance with standard policy does not support an inference of retaliation. Furthermore, Plaintiff has not shown that the policy dissuaded him from bringing grievance appeals, as the special report shows that

he filed grievance appeals on multiple occasions when he had no funds in his inmate account. Special Report, Ex. 46.[7]

## B. COUNT II, DENIAL OF A RELIGIOUS DIET

In Count II, Plaintiff alleges that Defendants Miller, Morton, Brown, and Tinker denied him a religiously-mandated diet in violation of his rights under RLUIPA and the First Amendment. Amended Complaint, 14. He claims that he requested a religiously-mandated halal[8] diet through the prison's grievance process, but was denied under the prison's policy regarding religious diets. Id. at 15-16. He alleges that he has had to choose between adequate nutrition and his religious beliefs, resulting in hunger headaches, weight loss, muscle atrophy and a decline in his overall quality of life. Id. at 15. He claims that he was placed on grievance restriction in retaliation for his requests, further prolonging his access

---

[7]The "GEO Lawton Resident Account Summary" dated October 2, 2009, lists grievance fee withdrawals by the date of the withdrawal, and the description provides either the date the grievance was filed or the grievance number. Withdrawals were made for grievances where the "balance" column was zero on the following dates (where multiple withdrawals were made on the same date, the number of grievances filed on the same date is listed parenthetically): December 1, 2006, July 18, 2007 (7), June 15, 2007, August 10, 2007 (7) October 21, 2008, October 15, 2008 (4), June 29, 2008, June 18, 2008, December 14, 2008 (2), November 6, 2008 (2), May 14, 2009 (2), February 25, 2009.

[8]As the Tenth Circuit Court of Appeals recently explained:

There are varying Islamic dietary traditions among Muslims, some more strict than others. According to the Islamic Food and Nutrition Council of America (IFANCA) and Islamic Services of America (ISA), a "halal," or "lawful" diet, prohibits items deemed "haram" (or "unlawful"), including pork and its by-products, animals improperly slaughtered or killed, alcohol and intoxicants, blood and blood by-products, and foods contaminated with haram products.

Abdulhaseeb v. Calbone, 600 F.3d 1301, 1313 (10th Cir. 2010).

to a nutritionally adequate diet.  Id.  He alleges that he has provided proof that a halal diet is required by his Muslim faith, and that the prepackaged "My Own Meals" already provided to those on an approved kosher diet are also marked "halal" and would meet his religious requirements.  Id. at 16.  He contends that Defendants Miller, Morton, Brown, and Tinker, "with knowledge of a clearly established right denied plaintiff's relief in the face of their injuries of starvation, loss of weight, deterioration of muscle to cause injuries from falls due to weakness and hinderance (sic) in overall quality of life."  Id. at 17.

All Defendants move for dismissal of this claim on grounds that Plaintiff has failed to exhaust his administrative remedies with regard to this claim. Motion of Defendant Miller, 4; Motion of Defendant Morton, 3.  Defendants Miller and Tinker move for dismissal on Plaintiff's religious diet claim on grounds that Plaintiff has failed to demonstrate that he is entitled to relief under either RLUIPA or the Free Exercise Clause of the First Amendment. Motion of Defendant Miller, 17, 24.  They claim that RLUIPA only permits actions against a governmental entity or a person in his or her official capacity.  Motion of Defendant Miller, 18.  They further contend that relief in the form of damages is at best uncertain under RLUIPA. Id.  They seek dismissal of any RLUIPA claim seeking damages, or which is brought against them as individuals regardless of the relief requested. Id. at 19.

Defendants Miller and Tinker also claim that Plaintiff has failed to demonstrate that the failure to provide him with an halal diet substantially burdens his religious practice.  Id. They claim that several courts have concluded that the halal diet is not a "central tenet" of Islam, and that the alternative provision of common fare vegetarian diets is rationally related

to the legitimate penological interests of simplified food service, security, and budget control. Id. at 19-20. They further claim that reducing costs, streamlining food production, limiting the number of required staff, consolidation of vendors and preventing security risks are compelling interests which support the policy. Id. at 20. They claim that there is no violation of RLUIPA when these compelling interests are compared to the "minimal burden" on Muslim inmates caused by the provision of only non-pork or vegetarian diets. Id. They also argue that the requirements for a kosher diet are set forth by ODOC policy and not by them. Id. at 21.

Finally, Defendants Miller and Tinker argue that Plaintiff has failed to demonstrate that denial of a kosher/halal diet is a violation of the Free Exercise clause. Motion of Defendant Miller, 24. They claim that under the four factors applicable to such claims, the failure to provide for a halal diet is reasonable. Id. at 24-25 (citing Turner v. Safley, 482 U.S. 78, 89-90 (1987)).

Defendants Miller, Tinker, and Morton also move for dismissal of Plaintiff's religious diet claim on grounds that Plaintiff has failed to show that they personally participated in the violation of his religious rights. Motion of Defendant Morton, 5-7; Motion of Defendant Miller, 9-11. Defendant Morton argues that Plaintiff's allegations against her are solely related to her involvement in the grievance process, and that she took no action other than to respond to his grievance appeals on the diet issue. Motion of Defendant Morton, 7. Defendant Miller claims that his role either as supervisor or as one who responded to some of Plaintiff's grievances does not constitute adequate personal participation under § 1983.

Motion of Defendant Miller, 9-10.  Likewise, Defendant Tinker claims that he only acted

pursuant to ODOC policy, and "Plaintiff did not include any policy decision made by or any

actual action taken by Defendant Tinker."  Motion of Defendant Miller, 10.

Plaintiff responds that a halal diet need not be a "central tenet" of Islam to be

protected under RLUIPA or the First Amendment.  Plaintiff's Response, 21.  He claims that

the denial of a diet conforming to his sincerely held beliefs substantially burdens his religious

practice.  Id. at 23.  He claims that the alternative vegetarian and non-pork diets are of

doubtful source, and that Defendants are forcing him to eat one of these diets or starve.  Id.

at 24.  He claims that the streamlining of food service is not a valid rationale because a

vendor already provides pre-packaged kosher meals which are also halal.  Id. at 25. He also

argues that the interest in a simplified and efficient food service is generally not a compelling

interest.  Id.  He contends that his religious practice is already burdened by having to pray

in forbidden areas, by not being allowed to carry oil to purify himself before prayers, by the

nonavailibility of congregational services, and the failure to allow participation in various

Islamic rituals and feasts.  Id.

### 1.  Exhaustion of Plaintiff's Religious Diet Claim

Defendants Miller, Tinker, and Morton move for dismissal of Plaintiff's religious diet

claim on grounds that he has failed to properly exhaust his administrative remedies. Motion

of Defendant Miller, 4; Motion of Defendant Morton, 3.  Defendant Morton maintains that

Plaintiff has failed to exhaust his administrative remedies, but does not provide any specifics.

Motion of Defendant Morton, 3-5. She argues that Plaintiff "did not timely and properly file

**any** grievances regarding the claims...." Id. at 5. Defendants Miller and Tinker allege that Plaintiff's original attempt to grieve the issue was improper because it included too many attachments, that his second attempt was returned for failure to follow the grievance procedure, that he failed to follow through on a third attempt, that he filed a fourth grievance to ODOC before allowing the facility head to respond, and that his fifth attempt was again returned for failure to follow the grievance procedure. Motion of Defendant Miller, 7.

Plaintiff responds that exhibits 18-1 to 18-4 to his complaint show that his religious diet claims were exhausted. Plaintiff's Response, 26. The undersigned agrees and finds that the administrative materials attached to the complaint, as well as the special report, show that Plaintiff did exhaust his administrative remedies with regard to his request for a religious diet. Complaint, Exs. 18-1 to 18-4; Special Report, Ex. 41. In the final response to grievance 08-491, Defendant Morton affirmed Defendant Miller's denial of a religious diet, and added "The inmate will have satisfied the exhaustion of administrative remedies required by 57 O.S. § 564." In making this finding, the undersigned acknowledges that this statement was not referencing the PLRA's exhaustion requirement, but Okla. Stat. tit. 57 § 564, which requires inmates to exhaust "available administrative remedies" prior to initiation of an action in "district court." The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) requires exhaustion of "available administrative remedies" prior to a federal suit over prison conditions. The statutes are distinct, but the "available administrative remedies" under the state and the PLRA exhaustion statutes are both determined by reference to ODOC's grievance policy. Compare  Hicks v. State ex rel. Oklahoma Dept. of Corrections, 227 P.3d

1097,1099-1100 (Okla.Civ.App. 2009) (to meet exhaustion requirement prisoner required to exhaust ODOC's four-step grievance process prior to filing state lawsuit) with Jones v. Bock, 549 U.S. 199, 218 (2007) (to properly exhaust administrative remedies prisoners must comply with the applicable procedural rules defined by the prison grievance process itself). None of the Defendants acknowledge that the September 10, 2008, appeal response states that the exhaustion requirement has been satisfied, and do not provide any argument supporting a claim that Plaintiff should be deemed to have exhausted administrative requirements for purposes of the state statute but not for purposes of the PLRA.  In fact, Defendants Miller and Tinker incorrectly cite this appeal response in support of their claim that "[o]n a fourth attempt, Plaintiff again overstepped the grievance procedure by filing a grievance to DOC before allowing the facility head to respond to his grievance."  Motion of Defendant Miller, 7 (citing Special Report, Exs. 36-41).  In fact, although an earlier appeal was returned unanswered on this ground, Defendant Miller later responded to Plaintiff's grievance and denied his request to eat the prepackaged "My Own Meals" which are both kosher and halal  Special Report, Ex. 40.  The appeal response of September 10, 2008, affirms this denial.  Special Report, Ex. 41.  In any event, Plaintiff did exhaust his request for a halal diet.

### 2.  Whether Denial of a Religious Diet Violates RLUIPA

The undersigned will first address Plaintiff's RLUIPA-based claim for the denial of a religiously-mandated diet.  The Tenth Circuit Court of Appeals recently addressed this issue in Abdulhaseeb v. Calbone, 600 F.3d 1301 (10th Cir. 2010).

Mr. Abdulhaseeb complains that ... he was denied a halal diet that included meat, in violation of RLUIPA. In relevant part, RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Thus, to proceed with his RLUIPA claim, Mr. Abdulhaseeb must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government.

Abdulhaseeb, 600 F.3d at 1312. Before it proceeded to the issue of whether there was a genuine issue of material fact precluding summary judgment in that case, the Tenth Circuit first noted: "Contrary to defendants' arguments, however, the issue is not whether the lack of a halal diet that includes meats substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens *Mr. Abdulhaseeb's* own exercise of his sincerely held religious beliefs." Id. at 1314. Thus, in this case the undersigned must specifically consider the sincerity of *Plaintiff's* belief that his religion requires the consumption of a halal diet, and that the vegetarian and non-pork alternative diets do not satisfy this requirement.

Defendants have not challenged the sincerity of Plaintiff's belief, and so have failed to show the absence of this essential element of the RLUIPA claim. The undersigned notes that the special report states that "on multiple occasions, Plaintiff purchased items from

Canteen that do not qualify as Halaal or Kosher." Special Report, 14 (citing Att. 46).

Attached to the special report are six pages which appear to be a listing of items Plaintiff

purchased from the commissary on March 6, 2007, March 13, 2007, April 9, 2007, April 16,

2007, January 28, 2008, and January 13, 2009. Special Report, Att. 46. However,

Defendants make no argument in their pending motion about this special report finding, and

there is nothing to support the special report's conclusion that the items listed are not halal.

Next, the undersigned must consider whether Plaintiff's sincerely held religious belief

is substantially burdened by the prison's failure to provide a halal diet. In Abdulhaseeb, the

Tenth Circuit defined substantial burden as follows:

> We conclude that a religious exercise is substantially burdened under 42
> U.S.C. § 2000cc-1(a) when a government (1) requires participation in an
> activity prohibited by a sincerely held religious belief, or (2) prevents
> participation in conduct motivated by a sincerely held religious belief, or (3)
> places substantial pressure on an adherent either not to engage in conduct
> motivated by a sincerely held religious belief or to engage in conduct contrary
> to a sincerely held religious belief, such as where the government presents the
> plaintiff with a Hobson's choice-an illusory choice where the only realistically
> possible course of action trenches on an adherent's sincerely held religious
> belief.

Abdulhaseeb, 600 F.3d at 1315. Noting that the first two parts of the test need no further

explanation, the Tenth Circuit turned to two United States Supreme Court decisions in order

to further define "substantial pressure":

In Thomas, the Supreme Court held that

> [w]here the state conditions receipt of an important benefit upon
> conduct proscribed by a religious faith, or where it denies such
> a benefit because of conduct mandated by religious belief,
> thereby putting substantial pressure on an adherent to modify his

behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

Similarly, in Sherbert, the Court stated,

[h]ere not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forgo that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.

Abdulhaseeb, 600 F.3d at 1315 (quoting Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 717-18 (1981) and Sherbert v. Verner, 374 U.S. 398, 404 (1963)). Based on the record in Abdulhaseeb, the Tenth Circuit found that there was a genuine issue of material fact as to whether the denial of a halal diet substantially burdened the plaintiff's sincerely held religious beliefs: "It is a reasonable inference that ODOC's failure to provide a halal diet either prevents Mr. Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice-either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat." Abdulhaseeb, 600 F.3d at 1316-17. Mr. Abdulhaseeb's verified complaint[9] and administrative materials showed that he believed he

---

[9]"[A] verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e)." Abdulhaseeb, 600 F.3d at1311 (quoting Conaway v. Smith, 853 F.2d 789, 792 (10th Cir.1988) (per curiam)).

was forced to choose between his religious practice and adequate nutrition.  Id.   The same is true in this case.  In his Amended Complaint, Plaintiff states that he has experienced headaches, a sixty-pound weight loss, and muscle atrophy due to inadequate nutrition stemming from the denial of a halal diet.  Amended Complaint, 16.  His administrative grievance materials also state that he has been forced to eat smaller and smaller amounts of food because he cannot eat some of the items on his tray.  See e.g. Special Report, Ex. 27, p.2.  Accordingly, there is a genuine issue of fact as to whether the denial of a halal diet substantially burdens Plaintiff's religious exercise.

However, that does not necessarily preclude summary judgment in favor of the Defendants; rather, the burden of proof shifts to them to show that the denial of a halal diet to Plaintiff is both in furtherance of a compelling governmental interest, and is the least restrictive means of furthering that compelling governmental interest.  Abdulhaseeb, 600 F.3d at 1318. The undersigned finds that Defendants have failed to establish their entitlement to summary judgment on these issues.  Because it is Defendants who must come forward with proof of a compelling governmental interest furthered by the least restrictive means, they must do more than argue that this is a weakness in Plaintiff's case.  Id.  Unfortunately, that is all they have done in the pending motion.

Defendants argue that the governmental interest in reducing costs, streamlining food production, limiting the required number of staff, maintaining consolidation of vendors, and preventing security risks are "compelling justifications under RLUIPA." Properly supported, some of these justifications are no doubt compelling. For example, the undersigned is well

21

aware of the budgetary challenges currently being faced by governmental agencies such as

ODOC.  That makes it all the more frustrating that counsel for Defendants, who know the

burden required of them by controlling Tenth Circuit precedent,  have come forward with

absolutely no evidence in support of these proffered justifications.  Further, Defendants have

completely failed to address – through argument or evidence – whether denying Plaintiff a

halal diet is the least restrictive means of satisfying its interests. These failures preclude

summary judgment in their favor:

> On appeal, the ... Defendants argue that providing a halal diet that includes
> meat "would have been cost-prohibitive and unreasonably time-consuming.
> Reducing costs, streamlining its food production, limiting the number of
> required staff, maintaining consolidation of its vendors, and preventing
> security risks are compelling justifications under the RLUIPA." One or more
> of these interests may well qualify as a "compelling governmental interest."
> In this appeal, however, we need not decide whether these interests satisfy the
> RLUIPA standard, because there simply is no record evidence regarding the
> defendants' contentions.  Further, there has been no discussion of whether
> refusing to provide a halal-certified diet is the least restrictive means which the
> state can employ to satisfy its interests.

Abdulhaseeb, 600 F.3d 1318-19 (citations omitted); accord Levie v. Ward, No.

CIV-05-1419-HE, 2007 WL 2840388 at *18 (W.D. Okla. Sept. 27, 2007) ("Defendants

cannot simply assert that the current policy is the least restrictive way of achieving their

compelling state interest. They must demonstrate this fact through affidavits or other

evidence. Defendants have not done so, and therefore they have not shown they are entitled

to summary judgment as to this aspect of Plaintiff's RLUIPA claim.").

In summary, there is a factual dispute regarding the extent to which denial of a halal

diet burdens  Plaintiff's religious exercise, and there is no evidence as to either the nature of

the State's interests in denying the diet or the existence of less restrictive means to satisfy any compelling interests.

Although there are genuine issues of material fact precluding summary judgment on the merits of Plaintiff's religious diet RLUIPA claim, there is some question as to the relief available against these particular Defendants. Defendants Miller and Tinker argue that RLUIPA only permits cases against a government entity or against individuals in their official capacities. Motion of Defendant Miller, 18. They also contend that because RLUIPA only allows for "*appropriate* relief against a government," damages are unavailable. Id. at 19 (emphasis added). Thus, they argue that "to the extent Plaintiff seeks damages or any relief other than injunctive or declaratory relief under RLUIPA, his claims are barred." Id. In a similar vein, Defendant Morton contends that any claim for damages against her in her official capacity is barred by the Eleventh Amendment. Motion of Morton, 7.

First, the undersigned notes that every circuit to have addressed the question has uniformly held that in enacting RLUIPA, Congress did not intend to authorize damages actions against individuals in their *personal capacity*. Nelson v. Miller, 570 F.3d 868, 889 (7th Cir. 2009) ("Construing RLUIPA to provide for damages actions against officials in their individual capacities would raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause. Thus, as a matter of statutory interpretation, and to avoid the constitutional concerns that an alternative reading would entail, we decline to read RLUIPA as allowing damages against defendants in their individual capacities."); Rendelman v. Rouse, 569 F.3d 182, 188 (4th Cir. 2009) ("we agree

with defendants that <u>Pennhurst's</u> clear notice requirement resolves whether defendants in this case may be held liable for damages in their individual capacities, we need not consider defendants' broader assertion that a spending clause statute could in no instance condition a state's acceptance of federal funds on the creation of an individual capacity damages action"); <u>Smith v. Allen</u>, 502 F.3d 1255, 1275 (11th Cir. 2007) ("We agree that a construction of RLUIPA providing for individual liability raises substantial constitutional concerns. Consequently, we conclude that section 3 of RLUIPA-a provision that derives from Congress' Spending Power-cannot be construed as creating a private action against individual defendants for monetary damages").

The extent to which individuals may be liable for damages in their *official* capacities under RLUIPA is less than clear under current law. Five federal circuit courts of appeal have held that a claim for damages against individuals in their official capacities are improper under the Eleventh Amendment. <u>See</u> <u>Van Wyhe v. Reisch</u>, 581 F.3d 639, 654 (8th Cir.2009) (agreeing with "the analysis of the Fourth, Fifth, Sixth, and Seventh Circuits that RLUIPA's 'appropriate relief' language does not unambiguously encompass monetary damages so as to effect a waiver of sovereign immunity), <u>cert. denied</u> 2010 WL 545428 (May 24, 2010); <u>Nelson v. Miller</u>, 570 F.3d 868, 884-85 (7th Cir.2009); <u>Cardinal v. Metrish</u>, 564 F.3d 794, 801 (6th Cir. 2009), <u>petition for cert. filed</u>, 78 U.S.L.W. 3065 (July 22, 2009) (No. 09-109); <u>Madison v. Virginia</u>, 474 F.3d 118, 131 (4th Cir.2006); <u>Sossamon v. Lone Star State of Tex.</u>, 560 F.3d 316, 331 (5th Cir.), <u>petition for cert. granted</u>, 77 U.S.L.W. 3657 (May 24, 2010) (No. 08-1438). The United States Supreme Court granted a writ of certiorari in <u>Sossamon</u>

on the following issue: "Whether an individual may sue a State or state official in his official capacity for damages for violations of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. (2000 ed.)." Sossamon v. Texas ___ U.S. ___, 2010 WL 2025142, 1 (May 24, 2010). The Tenth Circuit has yet to weigh in, and the Adulhaseeb court declined to address the effect of Eleventh Amendment immunity on the availability of damages under RLUIPA because the defendants did not raise the issue.[10] Without any contrary guidance from the Tenth Circuit, and having been persuaded by the reasoning of the courts in the Fourth, Fifth, Sixth, Seventh, and Eighth Circuits, the undersigned finds that damages are not available against individuals acting in their official capacities.

However, Defendants Morton, Miller, and Tinker fail to address whether they, in their official capacities, are proper Defendants for purposes of "effective relief" under RLUIPA. Once again, the Tenth Circuit's recent decision in Adulhaseeb is instructive. First, the Court found that declaratory and injunctive relief was not available against defendants employed in facilities where the plaintiff was no longer housed – a circumstance absent in this action. Abdulhaseeb, 600 F.3d at 1311 (citing Green v. Branson, 108 F.3d 1296, 1300 (10th Cir.1997) (holding that once prisoner was released from the prison system, neither declaratory nor injunctive relief would have any effect on defendants' behavior)). However, it went on to state:

---

[10]Eleventh Amendment immunity is waivable and need not be addressed sua sponte. Abdulhaseeb, 600 F.3d at 1312 (citing U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 942 (10th Cir. 2008)).

Even if Mr. Abdulhaseeb cannot recover money damages against any defendant or injunctive relief against the prison-specific defendants [from prisons where plaintiff is no longer housed], the courts may still fashion some effective relief. The ODOC Defendants, particularly the director of ODOC, remain parties to the litigation. The reasons given for denying Mr. Abdulhaseeb's requests for halal foods involved ODOC policies, and the director of ODOC has final policymaking authority for ODOC. Mr. Abdulhaseeb remains incarcerated in ODOC's custody, subject to ODOC policies, and a judgment in his favor may require ODOC to modify those policies.

Id. at 1312. In this case, Plaintiff is still an ODOC prisoner and is incarcerated at the LCF facility where he claims Defendants have unlawfully denied him an halal diet. Accordingly, should it be determined that denial of a halal diet to Plaintiff violates his RLUIPA rights, effective relief might indeed include an injunction prohibiting enforcement of the policy that was applied by Defendants Morton, Miller, and Tinker to deny him that diet. Although Defendant Morton does not have any apparent authority to *modify* the policy in question, as Director's Designee, she *applies* that policy in the process of reviewing religious diet grievances appealed to the ODOC director.[11] The Abdulhaseeb Court's broad interpretation of RLUIPA's grant of authority to the court to fashion "effective relief," combined with the movants' failure to address the issue, precludes a finding that "effective relief" could not, as a matter of law, include a prohibition on her application of the current policy in handling those grievances..

In summary, there are genuine issues of material fact precluding summary judgment

---

[11]Although the ODOC director would appear to be the most logical person to whom an injunction regarding the policy would be directed, he was not named as a party herein.

on behalf of Defendants Morton, Miller, and Tinker in their official capacities with regard to Plaintiff's RLUIPA religious diet claim.

### 3. First Amendment Claim for Denial of Halal Diet

Defendants Miller and Tinker contend that Plaintiff's claim that denial of a religious diet violated his rights under the First Amendment is without merit. Motion of Defendant Miller, 24. They argue that First Amendment claims brought by an incarcerated person such as Plaintiff are judged under a reasonableness test, one which is less restrictive than that ordinarily applied to First Amendment claims. Id. They claim that the four factors used to evaluate the reasonableness of such claims support denial of a halal diet. Defendant Morton moves for summary judgment on grounds that Plaintiff has failed to show her personal participation in the acts alleged. Motion of Morton, 6-7.

In his response, Plaintiff does not differentiate between his claims that denial of an halal diet violates his rights under both RLUIPA and the First Amendment. Plaintiff's Response, 20-21. He does specifically argue that neither the non-pork nor the vegetarian common fare diets are an alternative to a halal diet. Id. at 24.

"The Free Exercise Clause mandates that prison authorities afford prisoners reasonable opportunities to exercise their sincerely held religious beliefs." Hammons v. Saffle, 348 F.3d 1250, 1254 (10th Cir. 2003) (citing O'Lone v. Shabazz, 482 U.S. 342, 348 (1987)). Moreover, it is clearly-established law in this circuit that prisoners have a constitutional right to a diet conforming to their sincerely held religious beliefs, unless denying the diet is "reasonably related to legitimate penological interests." Beerheide v.

27

Suthers, 286 F.3d 1179, 1184-1185 (10th Cir. 2002). As Defendants argue, the court must weigh several factors to determine whether a prison regulation is reasonably related to a legitimate penological interest. Id. at 1185; see Hammons, 348 F.3d at 1255. The relevant factors are: (1) whether there is a rational connection between the prison regulation and the asserted penological interest; (2) whether alternative means of exercising the religious right in question remain open to inmates; (3) the impact of the accommodation of the right in question on guards and other inmates and on the allocation of prison resources; and (4) whether any ready, easy to implement alternatives exist that would accommodate the right in question. Beerheide, 286 F.3d at 1185 (citing Turner v. Safley, 482 U.S. 78, 89-90 (1987)).

Turning to the first factor, the undersigned finds that Defendants Miller and Tinker have shown a rational connection between denial of a halal diet and the penological interests of containing costs and streamlining food service. See Beerheide v. Suthers, 286 F.3d 1179, 1186 (10th Cir. 2002) ("To satisfy this prong of the test, the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals.").

With regard to the second factor, whether alternative means of exercising the religious right in question remain open to inmates, Defendants Miller and Tinker argue that the Court should not limit its consideration to the particular religious practice at issue, but should consider "whether the inmate has been denied *all means* of religious expression." Motion of Defendant Miller, 26 (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-52 (1987))

28

(emphasis added). However, Defendants read <u>O'Lone</u> too broadly.

The practice at issue in <u>O'Lone</u> was Jumu'ah, a weekly Muslim congregational prayer service. <u>O'Lone</u>, 482 U.S. at 345. Thus, in considering the second factor, the Court considered whether alternatives to that religious ceremony were available. "Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies. The record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations." <u>O'Lone,</u> 482 U.S. at 352.

The undersigned does not read <u>O'Lone</u> as standing for the proposition that any form of religious expression can be freely substituted for any other. In fact, in <u>Beerheide</u>, the Tenth Circuit applied the second factor only with reference to the right to maintain a kosher *diet*: "It is one thing to curtail various ways of expressing belief, for which alternative ways of expressing belief may be found. It is another thing to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion." <u>Beerheide</u>, 286 F.3d at 1192. The undersigned is not persuaded that the right to congregate, pray, or to possess a Qur'an are alternatives to following Islamic dietary laws. Thus, Defendants' argument that the Court should consider other allowable religious exercise, such as possession of the Qur'an and Islamic literature, as an alternative means of adhering to a halal diet is not well taken. <u>See</u> Motion of Defendant Miller, 26 (citing Special Report, Ex. 24, ODOC-OP 03-0112). The undersigned notes Defendants' claim that Plaintiff could request a non-pork or vegetarian common fare diet, which could

conceivably be a relevant alternative under the second factor. However, Plaintiff has alleged, under oath, that these common fare diets do not satisfy Islamic law. Defendants Miller and Tinker have failed to dispute this allegation, and the undersigned cannot at this stage simply assume that these diets are alternative means of satisfying Islamic law.

Defendants only address the third <u>Turner</u> factor in relation to religious services, prayer oil and religious headgear. Motion of Defendant Miller, 26. Thus, they have made no showing that there would be any impact upon guards or other inmates if Plaintiff's religious diet were accommodated.

Fourth, and finally, Defendants Miller and Tinker argue that ODOC's policy of allowing inmates to purchase halal or kosher items from the commissary, and permitting inmates to request a vegetarian diet, are alternatives that accommodate the right in question at a de minimis cost to the prison. Motion of Defendant Miller, 27. However, it is Plaintiff's argument that the prepackaged "My Own Meals" provided to inmates on a kosher diet are also marked halal and would thus easily accommodate his right to a religious diet. Defendants do not respond to this specific allegation. Although the prison authorities need not "set up and shoot down every conceivable alternative," to satisfy the fourth <u>Turner</u> factor, they should certainly address the only alternative suggested by Plaintiff. <u>Cf.</u> <u>Turner</u>, 482 U.S. at 90. In <u>Beerheide</u>, the Tenth Circuit was faced with a similar dearth of evidence:

> The DOC contends on appeal that it is "indisputable" kosher meals will cost the prison more than regular meals. We agree, but we cannot say the district court was clearly erroneous in finding that it could not evaluate the impact on the DOC budget on this record. The DOC failed to present reliable evidence that the cost impact would be more than de minimis.

Beerheide, 286 F.3d at 1190.

The undersigned disagrees with Defendant Miller and Tinker's conclusion that each "factor in the Turner analysis weighs in favor of Defendants regarding First Amendment free exercise claims." Motion of Defendant Miller, 27. The first factor, which only requires a minimal showing of rational relationship between the policy and penological goals, appears to be the sole one supporting a finding of reasonableness. There is enough question as to preclude a summary disposition of the claim the denial of a halal diet violates Plaintiff's First Amendment rights.

However, this still leaves the question of whether any of the Defendants named in Count II personally participated in any violation of Plaintiff's First Amendment rights. The undersigned finds that Plaintiff has failed to show such personal participation on the part of Defendants Miller or Morton. Defendant Miller's responsibility over operation of LCF is not in and of itself personal participation in any violation of constitutional rights that took place at that facility:

> "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir.1997). Supervisory status alone does not create § 1983 liability. Duffield v. Jackson, 545 F.3d 1234, 1239 (10th Cir.2008). Rather, there must be "an affirmative link ... between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Green v. Branson, 108 F.3d 1296, 1302 (10th Cir.1997) (quotation and brackets omitted).

Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009). As recently stated by the United States Supreme Court:

In a § 1983 suit or a <u>Bivens</u> action-where masters do not answer for the torts of their servants-the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

<u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009). Similarly, without more, the denial of grievances does not constitute personal participation: "We agree with the reasoning in our previous unpublished decisions that a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." <u>Gallagher</u>, 587 F.3d at 1069.

Under these guidelines, Plaintiff has failed to show any personal participation on the part of Defendant Miller in the denial of his religious diet other than to deny grievances regarding the request. ODOC policy regarding religious services specifically gives the facility chaplain sole authority to approve or disapprove religious restricted meals. <u>See</u> Special Report, Ex. 24, p. 8. The only involvement of the facility head with regard to religious menus appears to be the requirement that he and the chaplain approve any private donations or purchases of special food for religious festive or ceremonial meals. <u>Id.</u> at 9.

However, the undersigned finds that Plaintiff has made a showing that Defendant Tinker may have been personally involved in the alleged violation of his right to a religious diet. Although Defendant Tinker contends that he was only applying ODOC policy in denying Plaintiff a halal diet, Plaintiff alleges that he did have apparent discretion in

approving religious diets.  Special Report, Ex. 24, 8 and Att. C.  Plaintiff also alleges that

there were "unpublished" instructions regarding the availability of kosher diets for inmates

who are neither Jewish nor adherents of the House of Yahweh.  Amended Complaint, 15.

He attaches an exhibit identified as an Intrafacility Communication From a Chaplain to an

Inmate, which he claims was part of the two-page response he received to a request to staff

addressed to "Chaplain Rager, Religious Coordinator."  Amended Complaint, Ex. 15-1 and

15-2. The first page of the response is a form which states:

> In accordance with the guidance of the Agency Chaplain of the Oklahoma
> Department of Corrections, your faith group/religion is not currently approved
> to receive kosher meals.  Please provide an outside religious authority in your
> faith group that can verify this practice and to also provide reference to
> religious literature documenting this practice as part of your faith.  *Your
> request will be considered on the basis of the information you provide*.

Amended Complaint, Ex. 15-2 (emphasis added).  The form lists Plaintiff as the "inmate

involved," and "Chaplain R. Tinker" as the "Staff member involved." <u>Id.</u>  The second page

contains the following paragraph:

> In recent discussions with our legal staff, we have decided to *change our
> practice somewhat regarding applications for a kosher diet.*  If you receive a
> request for a kosher diet from an inmate that is not Jewish or House of Yahweh
> (which are the only two groups we currently approve for the kosher diet),
> instead of denying the request immediately respond by asking the inmate to
> provide an outside religious authority in their faith group that can verify this
> practice and to also provide reference to religious literature documenting this
> practice as part of their faith.

Amended Complaint, Ex. 15-3 (emphasis added). There is a handwritten notation at the

bottom of the page stating "Mr. Rager verified that the information is their unwritten policy

on 10/10/07." <u>Id.</u>  Plaintiff alleges that he did provide the name of an outside authority and

referred to religious literature in his request. Amended Complaint, 16 and Exs. 14 and 16-1.

Plaintiff also alleges that when he asked Defendant Tinker for an explanation after his initial

request for a halal diet at LCF had been denied on December 1, 2006, Defendant Tinker

responded "you'll eat what is provided are [sic] starve it does not matter to him!." Amended

Complaint, 15 (citing Amended Complaint Ex. 13-8).

In another context, the Tenth Circuit has found that a state prisoner who claimed that

his Eighth Amendment rights were violated by the denial of access to free hygiene products

alleged adequate personal participation of the warden because the warden apparently had

some discretion with regard to application of the applicable prison policy:

> And, second, the complaint repeatedly recites that when corrections staff
> refused free hygiene products, they did so after reviewing Mr. Whitington's
> inmate account to determine if he had received inmate pay ... and whether at
> least some money showed as a balance. These two circumstances at least allow
> the complaint to cross over the low hurdle for stating a claim against Warden
> Estep with respect to whether or not he had flexibility to remedy individual
> inmate account or hygiene problems, assuming a legitimate reason to do so,
> and whether that flexibility can be shown to have a link to Mr. Whitington's
> situation.

Whitington v. Ortiz, No. 07-1425, 307 Fed.Appx. 179, 192 (10th Cir. Jan. 13, 2009).

In light of Plaintiff's verified allegations and ODOC policy – which gives the facility

chaplain authority to approve religious restricted diets –  the undersigned cannot conclude

as a matter of law that Defendant Tinker did not have some discretion to approve Plaintiff's

request for a halal diet.  The manner in which that discretion may have been exercised can

be sufficient personal participation to support an action under § 1983.

## C. COUNT III, DENIAL OF THE RIGHT TO OTHER RELIGIOUS EXPRESSION

In addition to his claim that the denial of a halal diet violates his rights under RLUIPA and the First Amendment, Plaintiff asserts that Defendants Miller, Morton, and Tinker canceled Islamic congregational worship in November of 2006, did not fully accommodate his observance of Ramadaan in the Fall of 2008, and by policy do not allow him to carry prayer oil on his person. Plaintiff's allegations fall into four categories:

• Al Jumu'ah services scheduled for November 10, 2006, were canceled due to security concerns during facility lock down. Plaintiff claims that the facility was "open" during this time and visitation and other religious services were taking place. Amended Complaint, 17-18 and Ex. 19-3. He also contends that another request to attend Al Jumu'ah services on November 17, 2006, received no response and that attendance was denied. Amended Complaint, Ex. 19-5 and 19-8.

• During Ramadaan in 2008, Plaintiff was denied some aspects of the observance, such as the ability to shower between 4:00 a.m. and 4:30 a.m., and morning reading and prayers before and after breakfast. Amended Complaint, 18 and Ex. 21-2.

• The facility refused to provide halal foods and sweets for the Eid-al-Adha feast. Amended Complaint, 18 and Exs. 21-3 and 23-1. He claims that the Eid-al-Adha feast scheduled for December 12, 2008, was canceled for "non-penological interest." Amended Complaint, 18.

• His request to purchase up to 4 ounces of prayer oil to carry on his person was denied. Amended Complaint, 18-19 and Ex. 36.

Defendant Morton contends that Plaintiff's claim concerning cancellation of Jumu'ah in 2006 is barred by the applicable statute of limitations. Motion of Morton, 2-3. She also moves for dismissal on grounds that she did not personally participate in the acts alleged, and that her only role was to process grievance appeals in connection with his administrative

appeals regarding these issues. Motion of Defendant Morton, 7.

Defendants Miller and Tinker also claim that they did not personally participate in the denial of religious services or objects. Motion of Defendant Miller, 10. Defendant Miller claims that his supervisory responsibility for the facility is not personal participation sufficient to support Plaintiff's claim against him, and Defendant Tinker contends that his only action was the denial of Plaintiff's requests to staff. Id. Defendants Miller and Tinker also argue that defendants in their individual capacities are not proper defendants under RLUIPA, and that damages are not available against them in their official capacities. Motion of Defendant Miller, 18-19. They contend that Plaintiff has failed to show that the religious services at issue were "a tenet of the Islamic belief," that they should be accorded "deference in setting regulations which accommodate the resources and security needs of the facility," and they did nothing other than follow ODOC procedure. Motion of Defendant Miller, 22-23. They claim that Plaintiff has failed to show that his religious practice was substantially burdened by the failure to facilitate certain religious observances or by the refusal to allow him to carry prayer oil on his person. Motion of Defendant Miller, 22-23. Defendants Miller and Tinker contend that Plaintiff's First Amendment claim fails because the cancellation of Jumu'ah, modification of Ramadaan observances, and denial of inmate's personal possession of prayer oil were reasonable under Turner. Id. at 24-27.

In response, Plaintiff contends that neither Jumu'ah nor personal possession of prayer oil need be central tenets of Islam in order to be protected religious practices under RLUIPA. Plaintiff's Response, 21. He claims that he is ordered to five daily prayers, but is denied

ready access to prayer oil which must be used by Islamic adherents for purification before

their prayers.  Id.  He claims that he is only allowed access to prayer oil on Friday at Jumu'ah

services, and then only if the chaplain is in his office.  Id.  He also contends that generally

allowing Defendants to cancel services for reasons of security would make all such actions

automatically permissible.  Id.  He claims that services are also canceled for blood drives,

holiday visitations, graduation ceremonies, and staff dinners.  Id. at 21-22.  He argues that

if he were to change his religion, "holiday feast foods" would be freely given, and he would

be allowed to attend 3 weekly congregational services "without cancellation."  Id. at 22-23.

With regard to the statute of limitations, Plaintiff argues that his RLUIPA claim is timely

under the applicable four-year limitations period, and that his administrative remedies were

not completed until March of 2007, making his First Amendment claim timely as well. Id.

at 8-9.

## 1.  RLUIPA Claims in Count III

### a.  Proper Defendants under RLUIPA

For the same reasons discussed above in connection with Plaintiff's RLUIPA religious

diet claim, the undersigned finds that RLUIPA does not support a claim against the

Defendants individually, and that any claim for damages against them in their official

capacities are improper under the Eleventh Amendment.  See Van Wyhe v. Reisch, 581 F.3d

639, 654 (8th Cir.2009) (agreeing with "the analysis of the Fourth, Fifth, Sixth, and Seventh

Circuits that RLUIPA's 'appropriate relief' language does not unambiguously encompass

monetary damages so as to effect a waiver of sovereign immunity....."),cert. denied 2010 WL

545428 (May 24, 2010); <u>Nelson v. Miller</u>, 570 F.3d 868, 884-85 (7th Cir.2009); <u>Cardinal v. Metrish</u>, 564 F.3d 794, 801 (6th Cir. 2009), <u>petition for cert. filed</u>, 78 U.S.L.W. 3065 (July 22, 2009) (No. 09-109); <u>Madison v. Virginia</u>, 474 F.3d 118, 131 (4th Cir.2006); <u>Sossamon v. Lone Star State of Tex.</u>, 560 F.3d 316, 331 (5th Cir.), <u>petition for cert. granted</u>, 77 U.S.L.W. 3657 (May 24, 2010) (No. 08-1438). Without any contrary guidance from the Tenth Circuit, and having been persuaded by the reasoning of the courts in the Fourth, Fifth, Sixth, Seventh, and Eighth Circuits, the undersigned finds that damages are not available against individuals acting in their official capacities.

However, Defendants Morton, Miller, and Tinker are proper Defendants for the purposes of injunctive relief under RLUIPA. In this case, Plaintiff is still an ODOC prisoner incarcerated at the LCF facility where he claims Defendants have unlawfully denied him the right to engage in certain religious practices. Accordingly, should it be determined that the acts alleged in Count III violate Plaintiff's RLUIPA rights, effective relief might indeed include an injunction prohibiting enforcement of the policy applied by Defendants Morton, Miller, and Tinker to deny him his requests. In making this finding, the undersigned notes RLUIPA does not contain its own statute of limitations, but a civil action brought under the Act is one "arising under an Act of Congress enacted after [December 1, 1990]," and therefore is governed by the four-year limitations period contained in 28 U.S.C. § 1658 (2008); <u>see</u> <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 382 (2004) (holding that four year statute of limitations applies if the plaintiff's claim against the defendant was made possible by a post-1990 enactment); <u>Al-Amin v. Shear</u>, No. 08-7681, 325 Fed.Appx. 190,

193 (4th Cir. Apr. 10, 2009) ("RLUIPA does not contain its own statute of limitations period. However, for civil actions 'arising under an Act of Congress enacted after [December 1, 1990],' the appropriate limitations period is four years."). Thus, Defendant Morton's contention that any claim related to cancellation of Jumu'ah in November 2006 is barred by the statute of limitations is without merit.[12]

### b.  Cancellation/Modification of Services under RLUIPA

In their motion, Defendants Miller and Tinker first claim that Plaintiff has not shown that cancellation of Jumu'ah in November of 2006 or the limitations placed upon the Ramadaan observance in 2008 substantially burdened his religious practice.  The undersigned agrees.  Plaintiff only claims that Jumu'ah was canceled on two occasions in November of 2006.  He was allowed to observe Ramadaan, but alleges that he was not allowed to engage in certain Ramadaan activities, such as being allowed to shower at 4:00 a.m., to be released to visitation for morning reading and prayer at 4:30, to have breakfast at 5:30, and then again be released to visitation for morning prayer to begin his fast. The facility's response to Plaintiff's request regarding denial of these activities states that the Ramadaan schedule had been set to conform to then-existing lock down restrictions, and that basic services were being provided. Amended Complaint, Ex. 21-2.  He does not allege that either of these practices continues, and only generally alleges that the facility sometimes uses

---

[12]As will be explained below, the undersigned recommends summary judgment on Plaintiff's First Amendment claims in Count III.  Thus, it is not necessary to consider whether any §1983 claims in that Count are barred by the applicable two year statute of limitations.

the space available for Jumu'ah for other special activities, such as blood drives and graduation ceremonies.

In Abdulhaseeb, the Tenth Circuit considered whether summary judgment is appropriate where there is only a de minimis burden on the religious exercise in question. Abdulhaseeb, 600 F.3d at 1321. Under consideration was the plaintiff's allegation that on one occasion jello or pudding, a questionable item for one observing a halal diet, had been placed on his tray rendering the entire tray inedible. Id. The Court noted that not every interference with religious exercise amounts to a substantial burden. Id. Isolated or de minimis incidents are not necessarily substantial burdens without some specific allegation that the practice continues:

> We accept Mr. Abdulhaseeb's contentions that the jello and pudding were questionable at best, and thus placing them on his tray rendered all the food on the tray contaminated and inedible for him. We are not willing to conclude, however, that every single presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise. Although we assume that as the frequency of presenting unacceptable foods increases, at some point the situation would rise to the level of a substantial burden, we need not decide that question. In this case, the record contains evidence of one specific incident of Mr. Abdulhaseeb purportedly being forced to accept jello and pudding on his tray. Otherwise, he submits only general allegations that the practice continues. "The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue of fact."

Abdulhaseeb v. Calbone, 600 F.3d 1301, 1321 (10th Cir. 2010) (citations omitted). As in that case, Plaintiff here has only shown two instances where Jumu'ah was canceled, and that some aspects of Ramadaan were modified in 2008 due to a lock down. In the most

conclusory of terms he alleges that Jumu'ah is sometimes canceled so that other activities can be accommodated, but refers to no specific incident other than that occurring in November of 2006. Accordingly, the undersigned finds that neither of these isolated incidents substantially burdened his religious exercise.

**c. Denial of Halal Foods and Sweets for Eid'adha under RLUIPA**.

Unlike the above two incidents, it appears that the denial of special foods during religious feasts is pursuant to ODOC's policy that feast foods will come from the standard menu served to the rest of the inmate population "unless specific food restrictions are required by the faith such as a pork-free meal." Special Report, Ex. 24 (ODOC OP-030112(VI)(B)(1). Thus, it is reasonably inferred that the denial of "feast foods" on November 13, 2008, was in accordance with this practice and will continue so long as Islamic inmates are not allowed a halal restricted diet. Amended Complaint, Ex. 23-1. Therefore, for the same reasons as those stated above with regard to Count II, there is a genuine issue of fact as to whether the denial of halal foods for the Islamic feast of 'Eid-adha substantially burdens Plaintiff's religious exercise. Furthermore, Defendants Miller and Tinker have failed to show that the denial of halal feast food is both in furtherance of a compelling governmental interest, and is the least restrictive means of furthering that compelling governmental interest. Abdulhaseeb, 600 F.3d at 1318. The undersigned finds that Defendants have thus failed to establish their entitlement to summary judgment on the issue of whether denial of halal food for the feast is in violation of RLUIPA.

### d. Denial of Personal Possession of Prayer Oil under RLUIPA

As with the feast foods, ODOC policy does not permit Plaintiff to carry prayer oil on his person. Plaintiff alleges that he is required to pray five times a day, and must use the prayer oil to purify himself. Plaintiff's Response, 25; Amended Complaint, 18-19; Special Report, Ex. 65. Apparently under ODOC policy, inmates are allowed to purchase up to 3 ounces of prayer oil which may only be used during religious services, and must be stored in the place of worship. See Special Report, Ex. 67.[13]

Defendants contend that Plaintiff has failed to demonstrate that the inability to carry prayer oil on his person substantially burdens his religious practice. They state that: "a governmental action or regulation does not rise to the level of a substantial burden on religious freedom if it 'merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.'" Motion of Defendant Miller, 23. Defendants do not provide a source for this quote, citing only "*Adkins v. Kaspar at 570*." In the "Table of Authorities" section of their brief, Defendants cite Adkins v. Kaspar, 339 F.3d 559 (5th Cir. 2004), but through the undersigned's independent research, it appears that Defendants meant to cite Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004). In any event, the Tenth Circuit has now defined substantial burden, and the undersigned finds that under that definition Plaintiff has raised

---

[13]Although the ODOC policy on religious services is included in the special report, only two of the seven attachments referred to in the policy are provided. One of the omitted attachments is Attachment A, which apparently addresses restrictions on the possession of perfumes, oil, and incenses. See Special Report, Ex. 24, ODOC OP-030112(VIII)(B)(3)

an issue of fact as to whether the lack of access to prayer oil during his five daily prayers substantially burdens his religious exercise. Plaintiff alleges that he is required to pray five times a day, and yet is only allowed access to prayer oil once a week at Jumu'ah services. Plaintiff's Response, 21. He claims that even then the oil is only accessible if the chaplain is available. Plaintiff's Response, 21. Thus, Plaintiff is prevented from preparing for his daily prayers, and there is substantial pressure for him to either forgo the prayers, or pray without prior purification. See Abdulhaseeb, 600 F.3d at 1315.

As with their motion regarding Plaintiff's RLUIPA religious diet claim, Defendants completely fail to address the compelling interest underlying ODOC's policy or whether the policy used is the least restrictive means for meeting those compelling interests. Accordingly they are not entitled to summary judgment on Plaintiff's RLUIPA prayer oil claim.

### 2. First Amendment Claims in Count III

Before proceeding to the analysis of Plaintiff's Count III claims under the First Amendment, the undersigned notes that "the standards under RLUIPA are different from those under the Free Exercise Clause." Abdulhaseeb, 600 F.3d at 1314 (citing Kay v. Bemis, 500 F.3d 1214, 1221 (10th Cir. 2007). Under RLUIPA, these differing standards can result in seemingly inconsistent outcomes when the same evidence is relied upon to defeat identical claims brought under both RLUIPA and the First Amendment. See Levie v. Ward, No. CIV-05-1419-HE, 2007 WL 2840388 at *17 (W.D. Okla. Sept. 27, 2007) (in moving for summary judgment on plaintiff's RLUIPA claim, ODOC defendants rely upon same evidence relied upon to defeat Plaintiff's First Amendment claim; although that evidence

entitles movants to summary judgment on issue of whether the restriction in question is acceptable under the First Amendment, it does not entitle them to summary judgment on challenge to that same restriction under RLUIPA).

First, the Free Exercise Clause applies only if the restrictions at issue affect a "sincerely held" religious belief. See LaFevers v. Saffle, 936 F.2d 1117, 1119 (10th Cir. 1991) ("plaintiff is entitled to invoke First Amendment protection if his religious beliefs are sincerely held" (citations omitted)). Summary judgment is rarely appropriate on this issue because the inquiry ordinarily turns on credibility, See Snyder v. Murray City Corp., 124 F.3d 1349, 1352-53 (10th Cir. 1997) ("The inquiry into the sincerity of a free-exercise plaintiff's religious beliefs is almost exclusively a credibility assessment, and therefore the issue of sincerity can rarely be determined on summary judgment." (citations omitted)), vacated in part on other grounds, 159 F.3d 1227, 1228 n.2 (10th Cir. 1998). In this case, Defendants do not contest the sincerity of Plaintiff's beliefs regarding the necessity for congregational prayer, Ramadaan observances, halal feast foods, and prayer oil purification.

Second, under the First Amendment, religious rights may be limited for prisoners if the restriction is "reasonably related to legitimate penological interests." Makin v. Colorado Dep't of Corrections, 183 F.3d 1205, 1209 (10th Cir. 1999) (citation omitted).  Thus, in evaluating Plaintiff's claims in Count III under the First Amendment, the Court must determine the validity of these restrictions on religious practice by balancing the four Turner factors discussed above in connection with Plaintiff's First Amendment religious diet claim.

The first factor is the existence of a rational connection between the prison regulation

and a legitimate penological interest. The undersigned finds that this factor would support the Defendants' actions. In the evaluation of this factor, the Court considers whether "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." <u>Turner</u>, 482 U.S. at 89-90. The Defendants have based the restrictions about which Plaintiff complains on objectives involving maintenance of order and security within the prison. These interests are considered "legitimate" as a matter of law. <u>See</u> <u>Hammons v. Saffle</u>, 348 F.3d 1250, 1254-55 (10th Cir. 2003) (stating that prison officials had legitimate penological interests in the maintenance of "prison order and safety"). Furthermore, the undersigned finds that a rational connection exists between these objectives and restrictions on the time and manner in which Plaintiff can engage in congregational worship, participate in religious festivals, and access prayer oils. The Tenth Circuit Court of Appeals addressed a similar issue in <u>Hammons v. Saffle</u>, 348 F.3d 1250 (10th Cir. 2003). In <u>Hammons</u>, a Muslim prisoner claimed that authorities had violated the First Amendment through a ban on inmates' possession of Muslim prayer oil in their cells. <u>Hammons</u>, 348 F.3d at 1255. Authorities claimed that they had legitimate penological interests in preventing the spread of illegal drugs, maintaining prison order and safety, deterring crime, and rehabilitating inmates. <u>Id.</u> The Tenth Circuit concluded that the ban on Muslim prayer oils could logically relate to the stated penological interests. <u>Id.</u> Like the policy at issue in <u>Hammons</u>, the alleged restrictions on the place and time of congregational worship during lockdown situations and Plaintiff's personal possession of prayer oil are logically related to penological interests.

Next, the Court should consider the availability of alternative means for Plaintiff to exercise his religious rights. "[A]n alternative means exists so long as some means, albeit not plaintiff's preferred means, of religious exercise is available." Hammons v. Saffle, 348 F.3d 1250, 1256 (10th Cir. 2003) (citation omitted) The administrative materials submitted by Plaintiff with his Amended Complaint show that congregational worship and observance of Ramadaan are normally available, but that they were at times canceled or modified due to lock downs or scheduling conflicts with other activities at the facility. He concedes that he is able to keep prayer oil at a designated place in the prison, and access it through the chaplain's office during congregational prayer. Even under the Plaintiff's view of the facts, the existence of these alternatives would support the reasonableness of the Defendants' restrictions.

The third factor is the impact that accommodation of the asserted constitutional right would have on guards, other inmates, and prison resources. The special report and the materials attached by Plaintiff to the Amended Complaint show that security concerns related to an ongoing or recently ended lock down led to cancellation of a few congregational worship services and modification of the traditional Ramadaan observance. Allowing inmates to congregate for any reason has an obvious impact on guards and inmates during times of heightened security. Allowing Plaintiff to carry an item such as prayer oil that has previously been subject to the control of the prison chaplain will obviously increase the burden on staff to monitor such inmate use and possession. However, the provision of halal foods for religious feasts could arguably be accommodated by allowing Islamic adherents to consume

the prepackaged kosher meals that are already part of the main menu for those on a kosher restricted diet.

The final factor is whether alternatives exist for the Defendants to satisfy their penological interests. This factor also supports the constitutionality of the restrictions alleged in Count III. The Supreme Court explained the relevance of this factor: "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." Turner v. Safley, 482 U.S. 78, 90 (1987). The Plaintiff argues that officials could schedule competing activities in different areas of the facility, or on days that do not conflict with his congregational worship, and that they could allow him to carry three ounces of prayer oil on his person for prayer purification. He argues that possession of prayer oil does not impact security interests any more than having soaps, shampoo, or other scented items. Amended Complaint, 19. These alternatives may be obvious, but scheduling facility activities and controlling inmates' possession of personal items cannot reasonably be considered "easy" in a prison setting, particularly in times of heightened security.

Application of these factors leads the undersigned to find that the religious restrictions alleged by Plaintiff in Count III are reasonably related to legitimate penological interests. Thus, it is recommended that Defendants Morton, Miller, and Tinker be granted summary judgment on the First Amendment claims contained in Count III. In light of this recommendation, it is not necessary to address Defendants' threshold arguments that they did not personally participate in any of the alleged constitutional violations, and that

47

Plaintiff's claim regarding cancellation of Jumu'ah in November 2006 is barred by the applicable statute of limitations.

### D. COUNT IV, EIGHTH AMENDMENT CLAIM FOR INADEQUATE MEDICAL CARE

In his fourth claim, against Defendants Carns and Halvorson, Plaintiff alleges that he has "long-term, and chronic ailments and painful injuries" and that upon transfer to LCF, he did not receive either the same or better care as that received at his former facility. Amended Complaint, 19. In his Amended Complaint, Plaintiff lists various requests to staff and grievances regarding medical care, claiming that some were denied or unanswered. Id.

Defendants Carns and Halvorson contend that a prisoner alleging denial or delay of adequate medical care in violation of the Eighth Amendment must prove both an objective and subjective element. Motion of Defendant Miller, 13. They claim that the special report, which contains Plaintiff's medical records, shows that he was provided ongoing medical care throughout his incarceration at LCF, and that he is only alleging that he should have received a different course of treatment than that which was provided. Id. at 17. They claim that he can at best show that he disagreed with the treatment and evaluations he received, and cannot show any deliberate indifference to his serious medical needs. Id.

Defendant Carns notes that Plaintiff has only included one request to staff to him, and that he responded by explaining the treatment Plaintiff had already been provided and would be provided. Motion of Defendant Miller, 16. Defendant Halvorson states that as Health Services Administrator, she has no authority to authorize or provide referrals, and that she

directed him to submit requests for medical services. Id. She states she was never aware of any risk to Plaintiff, never placed Plaintiff at risk for future harm, or denied him medical care. Id. Plaintiff responds that while he was housed at his former facility (Great Plains Correctional Facility) he was diagnosed with the chronic conditions of hypertension, heart murmur, bullet on spine, chronic back pain and spurs, knee pains, heel spur, asthma, and Bell's Palsey. Plaintiff's Response, 13. He claims that on his initial intake medical examination at LCF, he was told he would not be receiving knee braces, an extra pillow, or an extra mattress. Id. Plaintiff contends that at his first medical visit with Dr. Carns, he showed him his medical records from Great Plains showing the existence of various chronic conditions, but that Dr. Carns stated he would treat them "his way." Id. at 14. He claims while at LCF his condition has not improved, and that he has developed new injuries due to Defendants' choice to deny treatment by an "outside specialist." Id. He claims that a "Mr. Martin" told him new injuries would happen "bleeding bowels, kidney pains, pains inside legs near groin area, weight loss, headaches and etc." Plaintiff's Response, 14. He claims that he pleaded to be sent to a specialist for his hypertension because it would lead to heart disease if not properly treated. Id. He alleges that he lives each day in extreme pain and fear about his failing health. Id. He claims that the objective element of his Eighth Amendment claim is met because the failure to send him to a specialist has caused extreme pain, new injuries, and a deteriorating condition. Id. at 16. He claims that the subjective element is satisfied because the Defendants were given notice of his various ailments and yet failed to properly treat him and denied him access to medical personnel who could help him. Id. at

49

17-18.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's ban on cruel and unusual punishment if the deliberate indifference "constitutes the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal citation and quotation marks omitted). To prevail on a claim under 42 U.S.C. § 1983, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. The Supreme Court clarified the standards applicable to a claim that a prison official has been deliberately indifferent to an inmate's medical needs in violation of the Eighth Amendment in Farmer v. Brennan, 511 U.S. 825 (1994) and set forth the now familiar two-pronged inquiry, comprised of an objective and subjective component. In Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005), the Tenth Circuit Court of Appeals provided a thorough summary of the law applicable to such claims:

> A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. The test for constitutional liability of prison officials "involves both an objective and a subjective component."

> The prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim. Moreover, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."

The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." A prison medical professional who serves "solely ... as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role."

Id. at 751 (citations omitted).

With these standards in mind, the undersigned finds that Plaintiff has failed to come forward with evidence supporting his claim that he was denied adequate medical care or that his receipt of medical care was unconstitutionally delayed. Even if one assumes that Plaintiff has come forward with enough evidence to raise a fact question as to the objective element of his Eighth Amendment medical claim, the medical records attached to Plaintiff's Amended Complaint and included with the special report show that Plaintiff did in fact receive treatment on multiple occasions for the various ailments he identifies. There is nothing to support an inference that either Defendant Carns or Defendant Halvorson knew of and disregarded an excessive risk to Plaintiff's health or safety.

Indeed, the special report contains numerous requests to staff and grievances, all of which were answered despite Plaintiff's failure to use the medical request form procedure required by ODOC policy. Special Report, Exs. 76 (not approved for braces, pillows, mattresses; have received new glasses; will be scheduled to see doctor regarding chest pain); 77 (although no show for scheduled appointment, medications continued, need to reschedule

appointment to determine continuing need for verapamil); 79 (medical chart review completed, briefly taken off verapamil to evaluate need for it, blood pressure checked three times a week and medication for it prescribed, doctor advised Plaintiff to lose weight to decrease pain in knees and back and reduce blood pressure, doctor determined joints stable and no medical indications for back and knee brace); 81 (medical record shows receipt of medication for chronic conditions, doctor evaluated request for extra mattress, extra pillow, and braces, examined for chest pain including EKG, diagnosed as gastric reflux and anti-ulcer medication prescribed); 85 (request for extra mattress, pillow, insoles, and braces addressed, Elavil must be crushed per policy, submit request to medical to discuss concerns regarding lab work and medications); 86 (pursuant to medical request, examined for back, hip, and knee pain, abdominal pain, gas, pain under ribs, pain in neck and base of skull, loss of sleep and forgetfulness – mattress, pillow, insoles, knee and back brace not ordered and Elavil discontinued); 94 (examined by Dr. Carns pursuant to medical request form); 96 (pill crusher does not contain enough residue to cause allergic reaction, and may submit medical request for stomach complaints). The special report also contains Plaintiff's medical records indicating that he received medical evaluation or treatment on at least 114 occasions since his transfer to LCF in November of 2006. Special Report, Ex.97. Although Plaintiff might disagree with the treatment he received for his multiple ailments, there is nothing to indicate that treatment was ever refused or that a recommended treatment was denied. The undersigned has found no support for Plaintiff's claim that he was denied access to a heart specialist. His high blood pressure has been regularly monitored at LCF and he has received

medication for the treatment of hypertension. Plaintiff's conclusory allegations, which are made without any reference to the medical records or administrative materials – and are in fact contradicted by them – are insufficient to show that he was ever treated with deliberate indifference to his serious medical needs. Accordingly, Defendants Carns and Halvorson are entitled to summary judgment on Plaintiff's claims in Count IV.

## IV. SUMMARY OF RECOMMENDATIONS

In light of the forgoing, it is recommended that the motions to dismiss/for summary judgment be granted in part and denied in part as follows:

### A. Count I, Access to the Courts.

Because Plaintiff has failed to come forward with any showing of actual injury, it is recommended that Defendants Morton and Miller be granted summary judgment on Plaintiff's claim for violation of his right of access to the courts. It is also recommended that they be granted summary judgment on any claim that the failure to train Plaintiff on use of the grievance policy or the charging of grievance appeal co-pays violated his right to due process. *Thus, it is recommended that Defendants be granted summary judgment on Count I.*

### B. Count II, Religious Diet

In their individual capacities, it is recommended that Defendants Morton, Miller, and Tinker be granted summary judgment on any claim for damages under RLUIPA. Under the Eleventh Amendment, it is recommended that Defendants Morton, Miller, and Tinker be granted summary judgment for any claim for damages under § 1983 brought against them

in their official capacities. Because Plaintiff has failed to show their personal participation, it is recommended that Defendant's Morton and Miller in their individual capacities be granted summary judgment on Plaintiff's First Amendment religious diet claim. *If these recommendations are adopted, the claims remaining under Count II are Plaintiff's RLUIPA religious diet claim against Defendants Morton, Miller, and Tinker in their official capacities for injunctive relief, and Plaintiff's First Amendment religious diet claim against Defendant Tinker individually.*

### C. Count III, Other Religious Exercise

It is recommended that Defendants Morton, Miller, and Tinker be granted summary judgment on Plaintiff's RLUIPA and First Amendment claims related to cancellation of Jumu'ah in November 2006 and for restrictions upon the Ramadaan observance in 2008. It is further recommended that Defendants Morton, Miller, and Tinker be granted summary judgment on Plaintiff's First Amendment claim related to denial of halal foods during 'Eid-adha and denial of his request to carry prayer oil on his person. *If these recommendations are adopted, the remaining claims under Count III are those seeking injunctive relief under RLUIPA against Defendants Morton, Miller, and Tinker in their official capacities for denying Plaintiff's request for halal foods during the 'Eid-adha feast and his request to carry prayer oil on his person.*

### D. Count IV, Eighth Amendment Medical Care

It is recommended that Defendants Carns and Halvorson be granted summary judgment on all of Plaintiff's claims under the Eighth Amendment for denial of adequate

medical care.

## RECOMMENDATION

For the reasons and to the extent set forth above, it is recommended that the Motion to Dismiss/Motion for Summary Judgment of Defendants Miller, Halvorson, Carns, and Tinker [Doc. No. 41], and the Motion to Dismiss/Motion for Summary Judgment of Defendant Morton [Doc. No. 39] be granted in part and denied in part. The parties are advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court by July 19, 2010, in accordance with 28 U.S.C. § 636 and Fed.R.Civ.P. 72. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal questions contained herein. Moore v. United States, 950 F.2d 656 (10th Cir. 1991). This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, unless the matter is re-referred.

**ENTERED this 28th day of June, 2010.**

DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE